Cite as 2025 Ark. App. 470

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-24-445

|  |  |
|---|---|
|  | **Opinion Delivered** October 8, 2025 |
| CODIANNA HUTSON FRY<br>APPELLANT | APPEAL FROM THE POINSETT COUNTY CIRCUIT COURT<br>[NO. 56DR-18-130] |
| V. |  |
| JAMES LAIRE, JR.<br>APPELLEE | HONORABLE KIMBERLY BOLING BIBB, JUDGE |
|  | AFFIRMED |

**CASEY R. TUCKER, Judge**

Codianna Hutson Fry appeals the March 26, 2024 final order that denied her petition for modification of custody and held that James Laire, Jr., would retain custody of their minor child (MC). She argues that the court erred in not finding a material change in circumstances. We affirm.

On May 11, 2018, Laire, a resident of Truman, Arkansas, filed a complaint seeking a declaration of paternity and custody of MC, who was born on March 27, 2018. Fry filed an answer and counterclaim seeking custody and child support. The parties stipulated that Laire is the legal and natural father of MC. A final hearing was held on August 27, 2018, and an order was entered on September 14 ("Initial Order"). The relevant sections of the Initial Order are:

4. Joint custody was considered by the court but was found inappropriate for this case.

5. The Court finds that [Laire] spent more time in the home due to his physical disability; he is not required to work outside of the home, and he has a support system where he lives to help care for the child. [Laire] has additionally lived at the same location his entire life.

6. [Fry] is much younger, has moved around from state to state, and will have to work outside of the home to provide for herself and the minor child.

7. Therefore, [Laire] is hereby awarded sole custody of the minor child . . . subject to [Fry]'s visitation. . . .

. . . .

9. The minor child reaching the age of four years old or beginning Pre-K, whichever is later, shall be considered a material change in circumstances warranting a change in custody for the purposes of this case. The parties may either agree to a new visitation schedule or petition the Court for a modification of custody or visitation at the time.

On May 8, 2023, Fry filed a petition to modify custody, arguing that MC had reached the age of four and was about to begin kindergarten, thereby constituting a material change in circumstances under paragraph 9 of the Initial Order. Fry further argued that it was in MC's best interest that she be awarded sole custody, subject to Laire's visitation, due to MC's regular attendance at daycare and extracurricular activities while in Fry's care. Laire responded to the petition, denying that a material change of circumstance had occurred and denying that custody should be modified.

The court held a temporary hearing on August 16. The court denied a temporary change of custody because no emergency had been alleged.[1] The court ordered that Fry return MC to Laire's custody immediately. Laire, as legal custodian, had the right to determine where MC attended school. He enrolled her in kindergarten in Truman.

On March 18, 2024, the court held a final hearing. At the beginning of the hearing, the court stated that the ruling in paragraph 9 of the Initial Order—that MC's turning four or attending pre-K, whichever is later, would constitute a material change in circumstances— was not binding for purposes of determining whether there had been a material change in circumstances warranting a change in custody.

Bobby Johnson, a private investigator hired by Fry, testified about his observations and methods, including placing a tracking device on Laire's vehicle to monitor his activities without Laire's knowledge. Johnson testified that he followed Laire and observed his interactions with MC. Johnson tracked him from February 27 to March 7, 2024, during which time he noted that Laire frequently dropped MC off at his parents' house and did not spend significant time with her.

Fry testified that she had been living in a three-bedroom house in Tennessee along with her other child, MC2, who was three years old. She testified the house was big enough for MC to have her own bedroom. She testified that MC is sweet and smart and that MC

---

[1]Laire retained custody of MC subject to Fry's visitation: the first, third, and fourth weekends of the month, MC would be in Fry's custody. To the extent there was a three-day weekend per the school schedule, Fry's visitation would include the extra day.

earns As and Bs in school at Truman. She admitted she had never attended any parent-teacher conferences or sent any school supplies or clothing for MC.

Fry testified that during the summer of 2023, while MC was in her care, MC attended the daycare where Fry worked and had graduated from its pre-K program. Fry stated that she began the process of enrolling MC in kindergarten in Tennessee and requested MC's vaccination records, which she said were difficult to obtain because of Laire. She acknowledged, however, that once she received the records, she learned that Laire had kept MC up to date on her vaccinations. Fry also admitted that she kept MC past her usual summer visitation period, and until the August 2023 order requiring her to return MC to Laire's custody, she had intended to keep MC in her own care.

She further testified that Laire was not a good communicator and was inflexible as a co-parent. She claimed she was denied some telephone visits with MC when Laire would say that MC was "with [his] mom and dad" or "cranky." Fry added that Laire often complained about transportation costs, even though she offered to share those expenses. She stated that during custody exchanges, Laire would curse at MC and tell her to quit crying and that, until recently, MC would arrive at the exchanges dirty and in a pull-up (sometimes soiled). On cross-examination, she admitted that she had no photos showing that MC was dirty at the exchanges. She testified that until August 2023, the agreed-on visitation schedule was a bit unique but that she ended up having MC from the first Friday to the third Wednesday every month, and Laire would have custody from the third Wednesday until the first Friday every month.

Fry recounted an incident in which allegations were made against her then boyfriend. Laire filed a petition for order of protection on behalf of MC against Fry's ex-boyfriend, which ultimately was denied by the court. However, due to the allegations of abuse, she is no longer dating her ex-boyfriend.

Fry currently was working as a teacher's assistant, but she recently had been accepted into the integrated pre-K through third-grade teaching program at Lipscomb University, which she planned to start that summer. Fry emphasized her commitment to fostering a relationship with MC. Her support system included her adoptive mother, Barbara Fry, with whom she enjoyed a close relationship.

Laire testified about his living situation, disability, and financial status. He lives in the same two-bedroom home he lived in when the Initial Order was entered. Laire, a high school graduate, has a limited work history due to his disability. He currently receives $914 a month in Social Security disability benefits. At trial, Laire stated he was separated from his wife, Jamie Laire Luckett, who was jailed in October 2023, and planned to obtain a divorce.

Laire has had custody of MC since she was five months old. MC often stays with Laire's retired parents—50 to 60 percent of the time—because of convenience and her preference to stay there with her cousins who often stayed there. A home health nurse currently assists Laire with housekeeping and laundry due to issues with his left leg. Laire admitted that MC had last stayed overnight at his home about one week before the hearing and recently had spent more time with his parents because of his marital situation. He stated

that he is involved in MC's schooling, attends parent-teacher conferences, and stays in contact with her teachers. Even though MC may not stay with Laire at his home every night, Laire takes her to school and picks her up every day. He cooks for MC when she is with him. He takes her to all her doctors' appointments. She is surrounded by family and loves playing with her cousins. He also said he is going to become a better dad and take care of her on his own.

Laire testified that Fry has access to all of MC's records. Laire described regular exchanges of MC with Fry and mentioned recent changes in MC's behavior, citing the circumstances that caused him to file for a petition for an order of protection. As a result, MC had begun therapy with Families, Inc., to address her recent behavioral issues, but he said she is a healthy child.

Jamie Laire Luckett, who is currently married to—but separated from—Laire, testified about her previous residence with Laire. She described her role in caring for MC, including feeding and preparing her for bed. Jamie recounted instances when Laire disciplined MC with a paddle and a belt but stated that it had never gone too far "at all."

Charles Laire, Sr., Laire's father, testified about the family's living arrangements and support system. MC spends significant time at Laire's parents home where she has her own room and plays with her cousins. Charles confirmed that Laire participates in MC's care, including taking her to school and medical appointments. During cross-examination, Charles confirmed that MC wears pull-ups at night and sometimes during travel. He also

testified about the involvement of other family members in MC's care and the practical challenges of coordinating her exchanges between parents.

By order dated March 24, 2024, the court found that there had not been a material change in circumstances since the Initial Order. Specifically, the court found the following:

3. The Court has considered the age of the child as well as all relevant factors presented during the hearing on March 18, 2024. The proof before the Court is that the child has remained in the legal custody of [Laire] since September 14, 2018, and the age of five months old. [Fry] has exercised visitation pursuant to the September 14, 2018, order as well as the Temporary Order filed on September 5, 2023. The child is enrolled in kindergarten in Poinsett County, Arkansas. At the time of the final order in Page 1 of 5 2018, [Laire] was living in Poinsett County, Arkansas. [Fry] was living in Tennessee. There has been no material change with regard to the physical distance of the parties.

4. The Court finds, and the parties agree, that the child is doing well in school, is healthy and is a happy child by nature.

. . . .

7. The Court finds that [Laire] is disabled, was disabled at the time of the original award of custody to him and has had no major change with regard to his income or ability to provide for the minor child.

. . . .

9. The Court finds that both parties must rely on their respective families for assistance with living expenses from time to time. There is no material change with regard to either party's ability to provide for the minor child. The Court notes that the prior order of the Court does not require either party to pay support due to the amount of travel and visitation involved. The Court finds no material change with regard to the issue of child support.

10. The Court finds that the minor child spends a significant amount of time with her paternal grandparents when not visiting with[Laire]. The minor child enjoys spending time with her cousins and other members of her family while at her grandparents' home. [Laire] also spends time at his parents'

home on a daily basis. [Laire] admittedly relies on his parents for assistance with the child, but the Court finds no material change in this arrangement from the initial award of custody to [Laire]. The minor child has had a close relationship with her grandparents and has been spending a significant amount of time with them since she was 5 months old.

11. The Verified Petition to Modify Custody filed by [Fry] on May 8, 2023, is hereby denied. [Fry] has not sustained the burden of proof to justify a modification of the Court's order of custody filed September 14, 2018.[2]

## I. *Points on Appeal*

Fry raised two issues on appeal: (1) the circuit court erred when it found that no material change in circumstances was present; and (2) the circuit court erred in determining that the best interest of the minor child was served by Laire's maintaining custody.

Child-custody cases are reviewed de novo on appeal, but we will not reverse a circuit court's findings of fact unless they are clearly erroneous. *Carrillo v. Morales Ibarra*, 2019 Ark. App. 189, 575 S.W.3d 151. A finding of fact is clearly erroneous if, after reviewing all the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *Id.* Whether a circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses; therefore, we give special deference to the circuit court's superior position to evaluate the witnesses, their testimony, and the child's best interest. *Id.* The primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary. *Emis v. Emis*, 2025 Ark. App. 232.

Generally, courts impose more stringent standards for modifications than they do for initial determinations of custody. The reason for requiring more

---

[2]The court also included parenting provisions and a revised visitation schedule, which is not challenged on appeal.

stringent standards for modifications than for initial custody determinations is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues.

*Riddick v. Harris*, 2016 Ark. App. 426, at 3-4, 501 S.W.3d 859, 864. The party seeking modification has the burden of proving a material change in circumstances. *Id.* If that threshold is met, the circuit court must determine who should have custody, with the sole consideration being the best interest of the child. *Id.*

On appeal, Fry first argues that the circuit court clearly erred when it declined to follow paragraph 9 of the Initial Order that states when the child reaches four years old or pre-K, whichever is later, that event constitutes a material change in circumstances. Arkansas uses a present-based analysis when analyzing custody issues, and circuit courts must examine the changes and best interest of children presented as evidence to the court at the time of the final hearing, not changes that may occur weeks, months, or years down the road. *See Bell v. Bell*, 2022 Ark. App. 279, 646 S.W.3d 678. Paragraph 9 of the Initial Order dictated that a future event would trigger an automatic finding of a material change in circumstances—not based on evidence presented at the time. We find that such a provision is against Arkansas law, and the court did not clearly err in declining to enforce this provision of the Initial Order.

Fry next argues the circuit court's finding of no material change in circumstances was clearly erroneous. Determining whether there has been a material change in circumstances requires full consideration of the circumstances that existed when the first custody order was entered in comparison to the circumstances when the change of custody is considered.

*Reynolds v. Reynolds*, 2024 Ark. App. 229, 687 S.W.3d 584. Accordingly, we look at whether there has been a material change in circumstances since issuance of the last order of custody which was the Initial Order in this case. To establish a material change, it is essential to demonstrate that the changed circumstances are substantial and directly affect the child's welfare. *Emis, supra.*

On appeal, Fry argues that the circuit court's finding of no material change in circumstances was clearly erroneous because there was evidence that MC's living conditions would be better in Tennessee and that Fry had made significant improvements in her stability. Further, she argues that her adoptive mother, who resides nearby, provides additional support, which is a change since the original order was entered. Fry contends that Laire is inflexible and lacks communication, often preventing her from telephone visits with MC. While she claimed MC would arrive at the exchanges dirty, she failed to provide any photographic evidence. The court was free to believe or disbelieve her testimony. Credibility determinations are left to the circuit court. *Glisson v. Glisson*, 2018 Ark. App. 21, at 11, 538 S.W.3d 864, 870.

Fry contrasts her changes with Laire's changes since the Initial Order. The circuit court considered all of Fry's allegations that she claimed supported a material change in circumstances and concluded that she did not meet her burden of proof. The court gave a thorough analysis in its order finding no material change in circumstances, including that Laire lives in the same home; his parents continue to provide the same level of support; and while he remains disabled, there had been no change in his income or his ability to support

MC. We find no clear error in its finding that Laire's situation had not changed since the Initial Order.

To the extent Fry argues that the material change is the improvement in her life, this court has consistently held that a noncustodial parent's voluntarily choosing a better life—standing alone—is insufficient to support a material change in circumstances under our long-standing appellate precedent. *Jones v. Jones*, 326 Ark. 481, 491, 931 S.W.2d 767, 772 (1996).

## II. *Conclusion*

Because we affirm the circuit court's finding that no material change in circumstances occurred to support a modification of custody, we do not reach Fry's best-interest argument. *Reynolds*, *supra*.

Affirmed.

HARRISON and MURPHY, JJ., agree.

*Troutt Law Firm*, by: *R. Scott Troutt*, for appellant.

One brief only.